IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

GEORGE H. NASON,
      Plaintiff,

vs.                          Case No. 3:08cv427/RV/EMT

MICHAEL J. ASTRUE,
Commissioner of the
Social Security Administration,
      Defendant.
_____/

## REPORT AND RECOMMENDATION

      This case has been referred to the undersigned magistrate judge pursuant to the authority of 28 U.S.C. § 636(b) and Local Rules 72.1(A), 72.2(D) and 72.3 of this court relating to review of administrative determinations under the Social Security Act ("Act") and related statutes, 42 U.S.C. § 401, *et seq.*  It is now before the court pursuant to 42 U.S.C. § 405(g) of the Act for review of a final determination of the Commissioner of Social Security ("Commissioner") denying Plaintiff George H. Nason's application for Supplemental Security Income ("SSI") benefits under Title XVI of the Act, 42 U.S.C. §§ 1381–83.

      Upon review of the record before this court, it is the opinion of the undersigned that the findings of fact and determinations of the Commissioner are supported by substantial evidence; thus, the decision of the Commissioner should be affirmed.

I.      PROCEDURAL HISTORY

      Plaintiff filed an application for SSI on July 11, 2006.  The application was denied initially and on reconsideration.  On September 25, 2007, following a hearing, an administrative law judge ("ALJ") rendered a decision in which he found that Plaintiff was not under a "disability" as defined in the Act.  The Appeals Council remanded the case for additional proceedings on December 13,

2007.  On April 23, 2008, following a second hearing, the ALJ again rendered a decision in which he found that Plaintiff was not under a "disability."  On July 23, 2008, the Appeals Council of the Social Security Administration ("SSA") denied Plaintiff's request for review.  Thus, the April 2008 decision of the ALJ (*see* Tr. 7–18)[1] stands as the final decision of the Commissioner, now subject to review in this court.  <u>Ingram v. Comm'r. of Soc. Sec. Admin.</u>, 496 F.3d 1253, 1262 (11th Cir. 2007); <u>Falge v. Apfel</u>, 150 F.3d 1320 (11th Cir. 1998).  This appeal followed.

## II.    FINDINGS OF THE ALJ

On April 23, 2008, the ALJ made several findings relative to the issues raised in this appeal:

1)    Plaintiff has not engaged in substantial gainful activity since July 11, 2006, the date he filed his application for SSI.[2]

2)    Plaintiff has the following severe impairments: personality disorder with narcissistic and anti-social traits; depressive disorder, not otherwise specified ("NOS"); and post traumatic stress disorder ("PTSD").

3)    Plaintiff does not have an impairment or combination of impairments that meets or medically equals an impairment listed in 20 C.F.R. Part 404, Subp't. P, Appx. 1.

4)    Plaintiff is unable to perform any past relevant work, but he has the residual functional capacity ("RFC") to perform a full range of work at all exertional levels, with one non-exertional limitation (that is, he is limited to simple unskilled work).

5)    Plaintiff is considered a "younger individual," he has at least a high school education, and he is able to communicate in English.

6)    Transferability of jobs skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that Plaintiff is "not disabled," whether or not he has transferrable job skills.

7)    Jobs exist in significant numbers in the national economy that Plaintiff can perform, and he has therefore not been under a disability since July 11, 2006.

## III.    STANDARD OF REVIEW

---

[1] All references to "Tr." refer to the transcript of the SSA record filed electronically on November 7, 2008 (Doc. 12).  The page numbers in this Report and Recommendation correspond to those found on the bottom right of the transcript pages (not the page numbers assigned by the CM/ECF docketing system).

[2] Thus, the time frame most relevant to this appeal is from approximately July 2006 (*see* 20 C.F.R. § 416.335) through April 23, 2008, the date of the ALJ's decision.

Review of the Commissioner's final decision is limited to determining whether the decision is supported by substantial evidence from the record and was a result of the application of proper legal standards. Carnes v. Sullivan, 936 F.2d 1215, 1218 (11th Cir. 1991) ("[T]his Court may reverse the decision of the [Commissioner] only when convinced that it is not supported by substantial evidence or that proper legal standards were not applied."); *see also* Lewis v. Callahan, 125 F.3d 1436, 1439 (11th Cir. 1997); Walker v. Bowen, 826 F.2d 996, 999 (11th Cir. 1987). "A determination that is supported by substantial evidence may be meaningless . . . if it is coupled with or derived from faulty legal principles." Boyd v. Heckler, 704 F.2d 1207, 1209 (11th Cir. 1983), *superseded by statute on other grounds as stated in* Elam v. R.R. Ret. Bd., 921 F.2d 1210, 1214 (11th Cir. 1991). As long as proper legal standards were applied, the Commissioner's decision will not be disturbed if in light of the record as a whole the decision appears to be supported by substantial evidence. 42 U.S.C. § 405(g); Falge, 150 F.3d at 1322; Lewis, 125 F.3d at 1439; Foote v. Chater, 67 F.3d 1553, 1560 (11th Cir. 1995). Substantial evidence is more than a scintilla, but not a preponderance; it is "such relevant evidence as a reasonable person would accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427, 28 L. Ed. 2d 842 (1971) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 59 S. Ct. 206, 217, 83 L. Ed. 126 (1938)); Lewis, 125 F.3d at 1439. The court may not decide the facts anew, reweigh the evidence, or substitute its judgment for that of the Commissioner. Martin v. Sullivan, 894 F.2d 1520, 1529 (11th Cir. 1990) (citations omitted). Even if the evidence preponderates against the Commissioner's decision, the decision must be affirmed if supported by substantial evidence. Sewell v. Bowen, 792 F.2d 1065, 1067 (11th Cir. 1986).

The Act defines a disability as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). To qualify as a disability the physical or mental impairment must be so severe that the claimant is not only unable to do his previous work, "but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." *Id*. § 423(d)(2)(A).

Pursuant to 20 C.F.R. § 404.1520(a)–(g),[3] the Commissioner analyzes a disability claim in five steps:

1.      If the claimant is performing substantial gainful activity, he is not disabled.

2.      If the claimant is not performing substantial gainful activity, his impairments must be severe before he can be found disabled.

3.      If the claimant is not performing substantial gainful activity and he has severe impairments that have lasted or are expected to last for a continuous period of at least twelve months, and if his impairments meet or medically equal the criteria of any impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, the claimant is presumed disabled without further inquiry.

4.      If the claimant's impairments do not prevent him from doing his past relevant work, he is not disabled.

5.      Even if the claimant's impairments prevent him from performing his past relevant work, if other work exists in significant numbers in the national economy that accommodates his RFC and vocational factors, he is not disabled.

The claimant bears the burden of establishing a severe impairment that keeps him from performing his past work.  20 C.F.R. § 404.1512.  If the claimant establishes such an impairment, the burden shifts to the Commissioner at step five to show the existence of other jobs in the national economy which, given the claimant's impairments, the claimant can perform.  MacGregor v. Bowen, 786 F.2d 1050, 1052 (11th Cir. 1986).  If the Commissioner carries this burden, the claimant must then prove he cannot perform the work suggested by the Commissioner.  Hale v. Bowen, 831 F.2d 1007, 1011 (11th Cir. 1987).

---

[3] In general, the legal standards applied are the same regardless of whether a claimant seeks Disability Insurance Benefits ("DIB") or SSI, but separate, parallel statutes and regulations exist for DIB and SSI claims (*see* 20 C.F.R. §§ 404, 416).  Therefore, hereafter, citations in this Report and Recommendation should be considered to refer to the appropriate parallel provision.  The same applies to citations of statutes or regulations found in quoted court decisions.

IV.    PLAINTIFF'S PERSONAL, EMPLOYMENT AND MEDICAL HISTORY

A.    Personal History

Plaintiff obtained an undergraduate degree in business management and a law degree and then worked as an attorney in the United States for approximately twenty years (Tr. 51, 55, 390). Plaintiff subsequently moved to Brazil and lived and worked there from approximately July 2001 until he was arrested on November 12, 2003, on a warrant issued by the United States District Court for the Middle District of Tennessee (M.D. TN.).  The warrant was based on an indictment that charged Plaintiff with mail fraud, bank fraud, and conspiracy to commit mail and bank fraud (Doc. 16 at 3; Tr. 51–52, 179, 193).[4]  Following Plaintiff's arrest, he was held in Brazilian prisons for approximately twenty-two months, until he was extradited to the United States on September 9, 2005 (Doc. 16 at 4).

Plaintiff states that the prison conditions in Brazil were deplorable, and as a result he developed mental disorders that underlie his instant claim for SSI.  In relevant part, Plaintiff states he was housed in dirty, damp, dark, foul-smelling, rat-infested, and overcrowded cells with "hardcore criminals serving long sentences."[5]  He states that water was shut off in his overcrowded cell except for two hours during the day, making the toilet essentially inoperable, and that soap, toilet paper, toothpaste, and fresh clothes were not provided.  Plaintiff further states that all inmates were strip-searched twice a day, and that prison guards often threatened, hit, and extorted money from inmates, and "beat to death" a Chinese inmate.  Although Plaintiff was transferred to another Brazilian prison, he alleges that the conditions were not much better.  For example, he was locked in a small cell with one forty-watt lightbulb and was allowed outside for a walk only one hour every two to four weeks.  He was isolated from his family and unable to send or receive mail.  Plaintiff lost more than eighty pounds during his incarceration and suffered from depression, vision problems, and other physical problems due to lack of movement, insufficient light, and confinement conditions.

---

[4] Plaintiff later pleaded guilty to the charges and was disbarred (*see* Tr. 51–52).

[5] Plaintiff's allegations are derived from an affidavit dated December 30, 2005, which he submitted to the court in the M.D. TN. on or about January 6, 2006, in connection with his criminal case (*see* Tr. 192–202).

Plaintiff states that near the end of his incarceration he was sleeping eighteen to twenty hours a day, had trouble distinguishing day from night, and was confused and disoriented.

      B.    Relevant Mental Health Treatment and Consultative Examinations

When Plaintiff arrived in the United States, he was incarcerated in Nashville, Tennessee, and treated by health care providers with Correct Care Solutions ("CCS") (*see* Tr. 202, 359). The earliest CCS treatment record is dated November 3, 2005, shortly after Plaintiff's return to the United States (Tr. 359). Plaintiff complained of problems associated with hypertension, but results of a blood pressure check obtained on November 14, 2005, were within normal limits (*id.*). Plaintiff returned to CCS on December 20, 2005, and complained of a sore throat, congestion, and general aches, but he again made no mention of his Brazilian incarceration or experiencing mental difficulties related thereto (*id.*). On or about April 9, 2006, Plaintiff first mentioned to correctional staff his need for mental health services (*see* Tr. 365, 367), and he was seen on April 10, 2006 (Tr. 359). Plaintiff reported depression, anxiety, and possible PTSD, as well as bouts of disorientation, sadness, vivid memory flashbacks, impatience, and loss of interest (*id.*). Plaintiff was next seen by CCS on April 17, 2006, at which time he explained that he had been in a Brazilian prison for twenty-two months and "subjected to eating rice for days at a time, no lights, no water, and people getting beat up" (Tr. 361). He also reported that he had been mistreated, abused, and had seen people killed, although it was noted that Plaintiff talked about the experiences "very matter of factly" (Tr. 356–57). Upon evaluation Plaintiff was alert and oriented with good eye contact, thought form was coherent, thought content was appropriate, and insight and judgment were good (Tr. 361). The evaluator noted that Plaintiff "may have some depressive symptoms from his experiences—a lot of his issues are situational" (*id.*). It was also noted that Plaintiff's presumptive release date was June 21, 2006, and that Plaintiff stated his intention to move back to Brazil upon his release (*see id.*). On May 5, 2006, Plaintiff requested a follow-up visit, noting that he was still having sleep problems and experiencing symptoms of depression, and he was seen on May 16, 2006 (Tr. 360, 364). Plaintiff reported problems associated with PTSD, including nightmares related to his earlier incarceration, and it was noted that Plaintiff appeared to still be "very depressed" (Tr. 360). Plaintiff however, was again observed to be alert and oriented, with good insight and appropriate thought content and form, although he had a flat affect (*id.*). Plaintiff stated that he did not want medications and that he would

make another sick call request if he needed to be seen again (*id.*). On June 8, 2006, Plaintiff requested a follow-up visit, noting that he was still having sleep problems and experiencing symptoms of depression (Tr. 363). It appears that Plaintiff was seen the following day, June 9, 2006, and assessed with depression and PTSD at that time (Tr. 366). At a follow-up appointment on June 12, 2006, Plaintiff's affect was flat and his mood depressed, but otherwise his mental status examination was normal (*see* Tr. 355).

Plaintiff was released from jail on July 5, 2006, to serve a probationary sentence, and he underwent a court-ordered mental health evaluation on July 25, 2006, at the Guidance Center (Tr. 386, 390). Plaintiff advised the examiner[6] that his wife and stepdaughter were presently residing in Brazil, and he had only been able to speak to his wife two times in the past three years (Tr. 390). Plaintiff reported symptoms of depression, including isolation, sleep disturbances, poor appetite, and lack of energy, as well as symptoms of PTSD and generalized symptoms, including sweaty palms, irritability, and problems with concentration, memory, vision, balance, and coordination (Tr. 390–91). A mental status examination revealed that Plaintiff had a flat affect, his concentration was poor, and he appeared withdrawn, but he was oriented, and his thought content was normal, thought flow was organized, recent memory was "good," remote memory was "fair," and insight and judgment were "good" (Tr. 392). Notwithstanding, Plaintiff stated he had trouble with short-term memory, such as remembering telephone numbers, appointments, and names, but he was able to recall detailed childhood memories (*id.*). He also stated that he had a "great deal of self control and discipline" (*id.*). Plaintiff was assessed with PTSD and Global Assessment of Functioning ("GAF") scores of fifty-two (current and highest in the last year) and fifty (lowest in last year) (Tr. 393).[7]

---

[6] The record reflects that Plaintiff was evaluated by a "Treatment Professional" named Allison Braswell, but it does not reflect Ms. Braswell's credentials (*see* Tr. 393).

[7] GAF is the overall level at which an individual functions including social, occupational, academic, and other areas of personal performance. American Psychiatric Association, <u>Diagnostic and Statistical Manual of Mental Disorders</u> 30–32 (4th ed. 1994). It may be expressed as a numerical score. *Id.* at 32. A score between fifty-one and sixty reflects moderate symptoms (*e.g.*, flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (*e.g.*, few friends, conflicts with peers or co-workers). *Id.* A score between forty-one and fifty reflects serious symptoms (*e.g.*, suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (*e.g.*, no friends, unable to keep a job). *Id.*

Plaintiff returned to the Guidance Center on October 17, 2006, and was seen by Duane Peterson, M.D. (Tr. 389). Plaintiff reported symptoms similar to those reported on his first visit (*see* Tr. 387). Dr. Peterson noted that Plaintiff was alert, oriented, and cooperative, with no memory, perceptual, processing, or thought content problems, but his affect was "unusual," as Plaintiff showed "very little affect when discussing his traumatic events" (*i.e.*, he spoke at a normal rate, with normal rhythm, volume, and tone) (Tr. 388). Moreover, Dr. Peterson had to redirect Plaintiff "at least [fifteen] times" to stop him from "diverting [] questions" and taking the interview in "a certain direction which he thought it needed to go" (*id.*). Dr. Peterson also noted that Plaintiff was sweating profusely under his arms, even though the room was not hot, and that Plaintiff was very direct, to the point of handing Dr. Peterson a note indicating that he was disabled and unable to work due to PTSD and asking him to sign it, but Dr. Peterson declined to do so (Tr. 387–88). Instead, it was the opinion of Dr. Peterson that Plaintiff would actually benefit from going to work, as "compared to sitting around with little interaction with others," and from taking Zoloft (Tr. 389). Plaintiff, however, stated that he did not want any medication and that "no medication could work better than getting to go back to Brazil and seeing his wife and daughter" (*id.*). Plaintiff emphasized that his goal was to return to Brazil as soon as possible, and he advised Dr. Peterson that if he could get on disability he thought he could get to Brazil sooner (Tr. 387).[8] As for Dr. Peterson's opinion that Plaintiff would benefit from going to work, Plaintiff stated, "I would rather you [Dr. Peterson] be silent" on this issue (Tr. 389). And, with regard to medication, Dr. Peterson explained the risks, benefits, and side effects, but Plaintiff again declined any medication (*id.*). Similarly, Dr. Peterson offered Plaintiff a "return appointment in a few months for a check on how his mood is doing but he declined any appointment" (*id.*). In conclusion, Dr. Peterson described Plaintiff's level of functioning as "moderate," and he diagnosed Plaintiff with chronic PTSD and Narcissistic Personality Disorder[9] and assessed GAF scores of sixty (current, and highest and lowest in the last

---

[8] Plaintiff appears to have thought that his probationary term could be terminated early if he was deemed disabled, and he could return to Brazil once his probation was terminated (*see* Tr. 387).

[9] During the interview, Plaintiff maintained that former Vice President Al Gore's cousin, Stephanie Gore, and her partner were representing him in his case, but he was telling them what to do (Tr. 387). He also stated that he socialized with celebrities, models, etc. (*id.*).

year) (Tr. 388–89). Dr. Peterson also stated that Plaintiff came to the interview "for what seemed to be for the sole purpose of getting [Dr. Peterson] to sign" the note stating that Plaintiff was unable to work (Tr. 388).

On December 18, 2006, Plaintiff was seen by consultative examiner Scott Gale, Ed.D. (Tr. 395). Plaintiff explained that he was incarcerated in Brazil in very harsh environments while fighting his extradition to the United States and that one of his arguments against extradition was Tennessee's use of the death penalty, even though Plaintiff's charges would not have subjected him to the death penalty (Tr. 396). Plaintiff essentially complained of anxiety and depression with symptoms including loss of appetite, sleep disturbance, fatigue, dizziness, nightmares, disorientation, forgetfulness, and balance problems (Tr. 395–98). Plaintiff was alert and responsive, and he maintained good eye contact during the interview (Tr. 397). His mood was a mixture of anxiety and depression, affect was flattened, and thought processes varied and were circumstantial and even tangential at times but could be "brought back to a logical and coherent fashion" (*id.*). Some thought content revolved around feelings of persecution, and Plaintiff was "easily caught [] obsessing about his history and difficulties" (*id.*). Mr. Gale noted that Plaintiff was "preoccupied with relating the conditions of his incarceration in Brazil," and even brought printouts from the Internet about Brazilian prison conditions for Mr. Gale's review (Tr. 395, 397). Plaintiff also reported being fearful in public places and around other people, and he stated he did not drive because he did not feel he could be a safe driver, but he denied experiencing any type of hallucination (Tr. 397, 399). He stated he did not believe in medication, particularly psychiatric medications, and that he had no known drug allergies (Tr. 398). Plaintiff was able to partially perform mathematical computations, such as "serial sevens" to a certain number, but he could not subtract twelve from twenty-five without writing down the equation (*id.*). Mr. Gale opined that computational deficits might reflect deficits in Plaintiff's ability to concentrate (*id.*). In conclusion, Mr. Gale assessed Plaintiff with PTSD, noting that the diagnosis was complicated by Plaintiff's lack of sleep (Tr. 399). With regard to Plaintiff's functional capabilities, Mr. Gale opined as follows:

> His ability to understand and remember appears impaired. This would appear to reflect his memory and difficulties with sustained concentration and persistence. His ability to maintain social interaction may be limited as well. He continues to obsess after a few moments and his tangential speech may make social interaction more

difficult. His ability to manage stress associated with day-to-day activity could not [be] assessed at this time. The quality of his written material suggests some impairment in logical reasoning.

(Tr. 400).

Mr. Gale noted, however, that he saw Plaintiff "only for about an hour-and-a-half" on this one occasion and that his findings were based on "this one interview only" and should be considered "in conjunction with all available data" (Tr. 395). He also noted that Plaintiff was being seen at the mental health center and that Plaintiff's past records, as well as "collateral information," would be quite useful (*id.*).

On June 11, 2007, Plaintiff was seen consultative examiner Mary Elizabeth Walker, M.S., L.P.E.. She observed that Plaintiff's balance, gait and posture were normal, he had fair hygiene and grooming, and his clothing was appropriate for the weather although he was shabbily dressed (Tr. 420). She noted that Plaintiff was a fair historian and demonstrated fair cooperation (*id.*). Plaintiff reported that he did not like being in strange places, riding in a car, leaving his apartment, or being in Tennessee, and he had no interest in people (Tr. 421). On evaluation Plaintiff was oriented to time, place, and situation, and he demonstrated an average ability to answer logic-based problems, but he could not think abstractly (Tr. 422). He was unable to answer elementary mathematical equations or complete serial threes and serial sevens, portraying himself "as unable to retain the process" needed for these tasks (*id.*). Overall Plaintiff's cognitive ability was notably concrete, although he demonstrated some difficulty maintaining a logical and coherent train of thought (*id.*). Plaintiff's affect was flat throughout the interview, but when reporting sensational content such as the Brazilian prison conditions, he became animated and made it a point to make eye contact (*id.*). During the interview Plaintiff bit and picked at his fingernails and cuticles until they bled, and he repeatedly scratched his arms (*id.*). He demonstrated a fair to poor attention span, was responsive to questioning but did not present material in a linear fashion, and demonstrated a fair to poor degree of higher executive functioning (*id.*). Although Plaintiff's overall abilities appeared to be in the extremely low range of intellectual functioning, Ms. Walker noted this would contradict Plaintiff's reported high grades in college and high school as well as his reported management of several businesses in the past (*id.*). Ms. Walker also noted that despite Plaintiff's report of a loss of appetite, he had gained forty-seven pounds since his release from jail (*id.*). Moreover, testing conducted by

Ms. Walker, such as the Minnesota Multiphase Personality Inventory-2 ("MMPI"), suggested symptom amplification or blatant malingering (*id.*).

In addition to the MMPI, Ms. Walker administered other tests to Plaintiff, and she noted that although Plaintiff was cooperative during the testing, he appeared to have higher abilities than his test scores would suggest (Tr. 423). She therefore did not feel the test scores were valid but reported them only for the record (*id.*). Intelligence Quotient ("IQ") testing resulted in a Full Scale IQ score of sixty-five, which is in the extremely low range; a Verbal IQ score of seventy-two, in the borderline range; and a Performance Scale IQ score of sixty-three, in the extremely low range (Tr. 423–24). Other testing indicated that Plaintiff reads at a high-school level, spells at a fifth-grade level, and solves written arithmetic problems at a second-grade level, but Ms. Walker noted that Plaintiff's "extreme scores" appear to be intentional (Tr. 425). For example, she noted that during the MMPI testing Plaintiff had no difficulty understanding the test directions and had no questions during testing. Thus, his profile was "clearly invalid" with scores indicating that he had attempted to amplify his symptoms or create a "classic fake bad" profile (*id.*). Ms. Walker emphasized that Plaintiff appeared "to have attempted to significantly amplify existing symptomatology or has malingered psychological difficulties altogether" (*id.*).

In conclusion, Plaintiff was diagnosed with probable malingering and a possible underlying adjustment disorder with mild to moderate anxiety, as well as personality disorder, NOS, and he was assessed with a GAF score of sixty (Tr. 427). And, with regard to functional abilities, Ms. Walker noted:

> [Plaintiff] appears to be fully capable of understanding simple information or directions with the ability to put it to full use in a vocational setting. [His] ability to comprehend and implement multi-step complex instructions does not appear to be significantly impaired. [His] ability to maintain persistence and concentration on tasks for a full work day and work week is possibly mildly impaired due to underlying anxiety. [His] social relationships are possibly mildly impaired, as he reports a tendency to withdraw from others.

(*id.*).

On January 28, 2008, Jorge V. Boero, a clinical psychologist at the Guidance Center, reported that had been treating Plaintiff at the request of the probation department for approximately

the past year (Tr. 429).[10]   He noted that Plaintiff was being treated for chronic anxiety and depression caused by his Brazilian incarceration (*id.*).   He opined that Plaintiff had been unable to work and was not likely to be able to return to work any time soon (*id.*).   Dr. Boero also noted that he would continue to treat Plaintiff as requested by the probation department (*id.*).   Additionally, at Plaintiff's request, on March 18, 2008, Dr. Boero signed a medical source statement regarding Plaintiff's ability to perform work-related mental activities (Tr. 430–32; Doc. 21 at 24).[11]   The statement indicates that Plaintiff has marked limitations in the ability to understand, remember, and carry out complex instructions, and in his ability to make judgments on complex work-related decisions, but Plaintiff's abilities with regard to simple instructions or simple work-related decisions were not assessed (*see* Tr. 430).   The statement further indicates that Plaintiff is markedly limited in his ability to interact appropriately with the public, supervisors, and co-workers, and to respond appropriately to usual work situations and changes in a routine work setting (Tr. 431).   The marked limitations are noted to be based on Plaintiff's reports (*see* Tr. 430–32).   For example, where there is an area to identify factors that support the assessment of marked limitations in Plaintiff's ability to follow instructions, a handwritten note states that "Mr. Nason reports that he is chronically depressed and anxious due to several traumatic events in his life (e.g., loss of wife, [illegible,] incarceration in Brazil, which he reports affect his decision making, concentration, memory, and motivation to [illegible]" (Tr. 430).   Similarly, in identifying factors that support other marked limitations, such as Plaintiff's ability to interact with the public, handwritten notes state that "Mr. Nason states that his mood problem lead[s] to social isolation, social anxiety, irritability, lack of patience and poor motivation," and further, that "Mr. Nason reports sig[nificant] problems w[ith] concentration and memory" (Tr. 431).   It was also noted that in individual psychotherapy Plaintiff

---

[10] Plaintiff testified that he was unhappy with Dr. Peterson, requested a different doctor at the Guidance Center, and was therefore seen by Dr. Boero (*see* Tr. 67).   Plaintiff also testified that Dr. Peterson was "hostile" toward him, as was Ms. Walker, both of whom rendered opinions unfavorable to Plaintiff's claim for SSI benefits (*see* Tr. 67–68).

[11] The medical source statement is a pre-printed form and contains questions that ask whether functional abilities are limited by Plaintiff's mental impairments, and if so, asks that the limitations be rated as mild, moderate, marked, or extreme.   Moreover, if limitations are assessed, the form contains areas for handwritten notes where factors supporting the limitations are to be listed (*see* Tr. 430–32).

is obsessed with his past, claiming he has been treated unfairly, and that he struggles tremendously to focus on other, more positive matters, and his progress has been very limited (*id.*).

      C.      Other Information in Plaintiff's Claims File, Including the Opinions of Non-Examining Consultants, Plaintiff's Family Members, and a Medical Expert

On August 31, 2006, Kathryn G. Yarborough, Ph.D., completed a Psychiatric Review Technique form and Mental RFC Assessment (Tr. 368–85). Plaintiff's psychiatric condition was evaluated under Section (or "Listing") 12.06 of 20 C.F.R. Part 404, Sub't. P, Appx. 1 (anxiety-related disorders) (Tr. 368, 373). Dr. Yarborough opined that Plaintiff's condition did not satisfy the diagnostic criteria of the Listing (*see* Tr. 373, 378–79). As a result of Plaintiff's anxiety disorder, however, Dr. Yarborough noted that Plaintiff would have moderate restriction of activities of daily living; moderate difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence or pace; and no episodes of deterioration or decompensation (Tr. 378). Additionally, on the RFC Assessment Dr. Yarborough opined that Plaintiff was not "markedly limited" in any area of functioning but was "moderately limited" in nine areas and "not significantly limited" in eleven areas (*see* Tr. 382–83).

On January 22, 2007, Andrew J. Phay, Ph.D., completed the same forms as those completed by Dr. Yarborough (*see* Tr. 402–419). He, however, evaluated Plaintiff's condition under both Listing 12.06 <u>and</u> 12.08 (personality disorder) (Tr. 402). Nevertheless, Dr. Phay opined that neither condition satisfied the diagnostic criteria of the Listings (*see* Tr. 407, 409, 412–14). As a result of Plaintiff's anxiety and personality disorders, Dr. Phay noted that Plaintiff would have mild restriction of activities of daily living; moderate difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence or pace; and no episodes of deterioration or decompensation (Tr. 412). On the RFC Assessment Dr. Phay opined that Plaintiff was not "markedly limited" in any area of functioning but was "moderately limited" in six areas and "not significantly limited" in fourteen areas (*see* Tr. 416–17).

On or about March 25, 2008, Plaintiff's mother, brother, sister, and brother-in-law signed affidavits concerning Plaintiff's condition (*see* Tr. 299–308). The affidavits from Plaintiff's mother and brother are very similar and indicate Plaintiff has been living with then since his release from prison and that his personality has changed since his incarceration (Tr. 299–304). They each stated that Plaintiff sleeps a lot during the day but often does not sleep through the night, isolates himself,

does not bathe regularly, and rarely goes out in public and when he does he is "clingy" (*id.*). They noted that Plaintiff's coordination and dexterity are impaired, as he has cut himself with knives and can openers, and neither of them allow him to cook because he leaves the stove on or the water running, and he does not care if food has gone bad—he will eat it anyway (*id.*). Plaintiff's sister and brother-in-law also provided similar affidavits, stating first that Plaintiff came to visit them for three weeks in September 2007 (Tr. 305–08). They noted during Plaintiff's visit that his personality had changed, and that he was "distant" or "withdrawn," isolated himself, rarely spoke to anyone, did not bathe regularly, slept in the same clothes he wore during the day, had abnormal sleeping patterns, and had accidentally locked himself out of the house three times during his visit (*id.*).

Lastly, on March 31, 2008, medical expert George Davis testified at Plaintiff's administrative hearing (Tr. 61–72). Dr. Davis stated that he had reviewed the record and believed it supported diagnoses of PTSD, narcissistic personality disorder, and depressive disorder, NOS (Tr. 61–62). He opined, "giv[ing] the strongest credit" to Plaintiff, that Plaintiff has at most moderate limitations in social functioning and concentration, persistence and pace, and moderate difficulty dealing with the general public and authority figures, which is consistent with GAF scores in the range of fifty-six to sixty (Tr. 63, 65). Dr. Davis further opined that the opinion of Dr. Boero (*i.e.*, that Plaintiff is unable to work due to psychological problems) is not supported by the treatment records of the Guidance Center, including Dr. Peterson's records, or by other evidence, including Ms. Walker's report and opinions (Tr. 64–65). Dr. Davis also agreed with Ms. Walker's opinion—given Plaintiff's educational and employment background—that his IQ scores were indicative of malingering (Tr. 70–72).

V.    DISCUSSION

Plaintiff raises several issues in the instant appeal. Plaintiff asserts that the ALJ erred in failing to fully develop the record and in failing to comply with the remand order of the Appeals Council. Next, Plaintiff contends that the ALJ erred in finding him less than fully credible. Lastly, Plaintiff contends that the ALJ posed an incomplete question to the Vocational Expert.

A.    Development of the Record and Compliance with the Remand Order of the Appeals Council ("AC")

As previously noted, an ALJ has twice considered Plaintiff's claim for SSI. The ALJ initially rendered a decision on September 25, 2007, in which he found that Plaintiff was not

disabled, but on December 13, 2007, the AC vacated the decision and remanded the case for additional proceedings (*see* Tr. 114–15). In its remand order the AC noted that Plaintiff testified during his first administrative hearing, held September 10, 2007, that he was receiving counseling twice a month at the Guidance Center, but the most recent evidence in Plaintiff's claims file from the Guidance Center was dated October 17, 2006 (Tr. 114). Thus, the AC ordered that "[a]dditional medical evidence must be requested from this source to complete the administrative record" (Tr. 114). The order of the AC further stated that, "if necessary, evidence [should be obtained] from a psychiatric or psychological medical expert to clarify the nature and severity of [Plaintiff's] mental impairments and any limitations attributable to such impairments (20 C.F.R. § 416.927(f) [discussing the opinions of non-examining sources] and Social Security Ruling 96-6p [same])" (Tr. 115). Plaintiff contends the ALJ failed to comply with the foregoing directives of the AC, and correspondingly, failed to fully develop the record (*see* Doc. 16 at 11–14).

It is well established in this circuit that an ALJ has an affirmative duty to develop a full and fair record. Brown v. Shalala, 44 F.3d 931, 934 (11th Cir. 1995); Lucas v. Sullivan, 918 F.2d 1567, 1573 (11th Cir. 1990); Smith v. Bowen, 792 F.2d 1547, 1551 (11th Cir. 1986); Cowart v. Schweiker, 662 F.2d 731, 735 (11th Cir. 1981). The duty to develop the record exists even if the plaintiff is represented by a lawyer or paralegal.[12] Brown, 44 F.3d at 934 (citing Clark v. Schweiker, 652 F.2d 399, 404 (5th Cir. Unit B July 1981)); Smith, 792 F.2d at 1551 (citing Cowart, 662 F.2d at 735). This duty requires that the ALJ "scrupulously and conscientiously probe into, inquire of, and explore for all the relevant facts," be "especially diligent in ensuring that favorable as well as unfavorable facts and circumstances are elicited," Cowart, 662 F.2d at 735 (citations omitted), and "investigate the facts and develop the arguments both for and against granting benefits." Crawford & Co. v. Apfel, 235 F.3d 1298, 1304 (11th Cir. 2000). That does not mean, however, that the ALJ must search to the last document to find every possible piece of relevant evidence. Rather, he must have sufficient evidence to decide the case. The seminal cases in this circuit on the ALJ's duty to develop the record are Ford v. Secretary of Health and Human Services, 659 F.2d 66 (5th Cir. Unit B Oct.

---

[12] Although Plaintiff was once licensed as an attorney, he apparently was not licensed at the time of his hearings and proceeded *pro se*. Moreover, Plaintiff apparently did not practice in the area of Social Security disability before his disbarment (*see* Tr. 15, 71; Doc. 16 at 13–14).

15, 1981) and <u>Reeves v. Heckler</u>, 734 F.2d 519 (11th Cir. 1984). Both held that it is not necessary for an ALJ to order a consultative examination unless the record established that such an examination was necessary to enable the ALJ to make a decision. Where he has sufficient information to decide the case, however, he can do so. <u>Graham v. Apfel</u>, 129 F.3d 1420, 1423 (11th Cir. 1997) (holding that where the record is complete and adequate to make a decision, no showing of prejudice is made).

In the instant case, the record reflects that following the remand order of the AC a representative of the SSA sent a records request to the Guidance Center, seeking "All records from October 18, 2006 to present. Please send any CRG forms and ask Dr. to complete medical source statement." (Tr. 428). In response, Dr. Boero provided a letter dated January 28, 2008, indicating—in relevant part— that he had treated Plaintiff for approximately the past year and believed that Plaintiff had been and would continue to be unable to work, but he did not provide treatment records or return a completed medical source statement (Tr. 429). Later, on March 31, 2008, at Plaintiff's request, Dr. Boero signed a medical source statement, on which—in relevant part—Plaintiff was assessed with various "marked" functional limitations (*see* Tr. 430–31; Doc. 21 at 24). Thus, the medical source statement is now part of the administrative record (Tr. 430–32), but updated treatment records (i.e., from the Guidance Center from October 18, 2006, forward) were not obtained as ordered by the AC and are not a part of the administrative record.

The court notes, however, that in its remand order the AC stated that in addition to updated treatment records from the Guidance Center, other evidence should be obtained if necessary, including additional opinions from a non-examining agency psychologist, to clarify the nature and severity of Plaintiff's impairments and any related functional limitations. The ALJ followed the latter suggestion of the AC by calling Dr. Davis to testify as a medical expert at Plaintiff's hearing, held March 31, 2008. Like the other non-examining agency psychologists (*i.e.*, Dr. Yarborough and Dr. Phay), Dr. Davis reviewed Plaintiff's file and offered opinions regarding Plaintiff's functional limitations, including, in pertinent part, that Plaintiff has no "marked" limitations and is not precluded from work.

On April 23, 2008, the ALJ rendered a decision in which he found that Plaintiff was "not disabled," and on April 28, 2008, Plaintiff sought review of the decision by the AC (*see* Tr. 7–18,

334).  In seeking review, Plaintiff specifically stated as follows: "In the instant request for review, the claimant is not submitting new or additional relevant evidence for consideration but is asserting in part that the [ALJ] did not properly consider and weigh the probative value of the evidence appearing on the record and acted in a contrary manner." (Tr. 334).  Plaintiff, proceeding *pro se*, reiterated that he was seeking review, based not on any new evidence, but on the evidence that had previously been submitted and considered by the ALJ (*see* Tr. 336).  Plaintiff's request for review was denied on July 23, 2008 (Tr. 1).  In denying review, the AC "found no reason under [its] rules to review the [ALJ's] decision," and Plaintiff was advised of his right to seek review in this court (Tr. 1–2).  Plaintiff, having obtained counsel, then commenced this action by filing a complaint on September 23, 2008, and later filed a memorandum in support of the complaint (Docs. 1, 16).  Moreover, in support of the instant claim for relief, Plaintiff filed with the court updated treatment records from the Guidance Center (*see* Doc. 21 (treatment records filed on February 24, 2009, documenting Plaintiff's office visits with Dr. Boero between March 19, 2007, and April 28, 2008)).

Title 42 U.S.C. § 405(g) permits a district court to remand an application for benefits to the Commissioner by two methods, which are commonly referred to as "sentence four" and "sentence six" remands.  Sentence four of § 405(g) provides that the court shall have "power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing."  Sentence six provides that the court may, at any time, remand the application for benefits to the Commissioner for the taking of additional evidence upon a showing "that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding."  The Eleventh Circuit has recently clarified that sentence six is "the sole means for a district court to remand to the Commissioner to consider new evidence presented for the first time in the district court," as in the case at bar.  Ingram, 496 F.3d at 1267.  In order to do so, however, the court must find that the evidence is new, material, and that good cause exists for failing to submit the evidence below.  *Id*.  By this standard, to demonstrate that remand for consideration of new evidence is appropriate, Plaintiff must demonstrate that: (1) there is new, non-cumulative evidence; (2) the evidence is material (that is, relevant and probative so that there is a reasonable possibility that it would change the administrative result); and (3) there is good cause

for the failure to submit the evidence at the administrative level. *See* <u>Falge</u>, 150 F.3d at 1323; <u>Caulder v. Bowen</u>, 791 F.2d 872, 877 (1986).

Within this framework, the court will consider the new evidence presented for the first time in this court (Doc. 21). Initially, only one updated treatment record from the Guidance Center is "new"; that is, previously unavailable, as it was created on April 30, 2008, and documents an office visit on April 28, 2008, the date Plaintiff requested review by the AC (*see* Doc. 21 at 26).[13] The remainder of the updated treatment records are not "new" because they were available prior to Plaintiff's hearing before the ALJ and/or available prior to the date Plaintiff sought review by the AC (i.e., those records dated March 19, 2007, through March 17, 2008, available prior to Plaintiff's hearing, as well as an additional treatment record dated April 7, 2008, available prior to the date Plaintiff sought review by the AC) (*see* Doc. 21 at 2–25). *See* <u>Ingram</u>, 496 F.3d at 1267 (remand under sentence six is "appropriate when the district court learns of evidence not in existence or available to the claimant at the time of the administrative proceeding that might have changed the outcome of that proceeding") (citing <u>Sullivan v. Finkelstein</u>, 496 U.S. 617, 626 (1990); <u>Melkonyan v. Sullivan</u>, 501 U.S. 89, 98 (1991) (The sixth sentence allows the taking of "new evidence . . . that was not available to the claimant at the time of the administrative proceeding.")); *cf.* <u>Byrd v. Astrue</u>, 2009 WL 903290, at *6 (M.D. Ala. Mar. 31, 2009) (finding that evidence regarding plaintiff's hospitalization, which occurred after the appeals council denied review, was "new"). Thus, the undersigned concludes the evidence presented to this court is not "new" evidence.

Even if the updated treatment records were deemed "new," however (to the extent they are non-cumulative), Plaintiff must further establish that they are material. Plaintiff asserts the records are highly material, because <u>if</u> they support Dr. Boero's opinions on the medical source statement, those opinions would be entitled to controlling weight because Dr. Boero is a treating physician (*see* Doc. 16 at 18–19). Plaintiff, however, has not asserted that the records actually support the opinions, and the undersigned's review of the records suggests otherwise. For example, on <u>each</u> of the twenty-three treatment records, including the "new" treatment record dated April 28, 2008, Dr. Boero states that "[p]rogress was made toward goal(s)," which is inconsistent with Dr. Boero's

---

[13] The April 28 record, however, differs in no material respect from any of the earlier records (*compare* Doc. 21 at 2–25 *with* Doc. 21 at 26).

opinion on the medical source statement that "progress has been very limited" (*see* Tr. 431; Doc. 21). Moreover, the treatment records generally reflect that Plaintiff's response to treatment was "fair" or "fair to good" (*see, e.g.*, Doc. 21 at 2, 4, 5, 6, 12), and his mood was sometimes characterized as only "mildly" depressed or dysphoric, although on other occasions Plaintiff was noted simply to be "depressed" (*id.* at 6, 11, 15, 19). Additionally, on one occasion Plaintiff reported that he enjoyed coming to therapy and that it was helping him with his depression "to some extent" (Doc. 21 at 19). Thus, overall, the records do not support Dr. Boero's opinions that Plaintiff has marked functional limitations and is incapable of work, and it is highly unlikely that the ALJ would have fully credited those opinions had the updated treatment records been considered. Plaintiff has therefore failed to carry his burden of showing a reasonable possibility that the updated treatment records could be expected to change the outcome of the case. Caulder, 791 F.2d at 877 (citing Wright v. Heckler, 734 F.2d 696 (11th Cir. 1984); Chaney v. Schweiker, 659 F.2d 676, 679 (5th Cir. 1981)). Notwithstanding, the AC previously determined that the administrative record was incomplete without post-October 2006 records from the Guidance Center (although the AC did know the content of those records), and to the extent the AC's earlier determination could be construed as a finding that the records at issue are "material," the undersigned will consider whether Plaintiff has met the final prong for remand; that is, good cause for his failure to submit the evidence below.

Because the ALJ was specifically ordered to obtain the records at issue, and a letter was sent to Dr. Boero requesting the records, Plaintiff could have reasonably assumed that he had no obligation to obtain the records prior to his administrative hearing; thus, Plaintiff may have established good cause for his failure to submit the records to the ALJ. The court notes, however, that the records request also sought a medical source statement, and when one was not produced by Dr. Boero, Plaintiff obtained one and provided it to the ALJ (*see* Doc. 21 at 24). It would seem, therefore, that Plaintiff had the same ability as the ALJ to obtain the treatment records because he was able to obtain a medical source statement. The relevant inquiry, though, is whether Plaintiff has established good cause for his failure to submit the records to the AC. *See* Ingram, 496 F.3d at 1269 (citing White v. Barnhart, 373 F. Supp. 2d 1258, 1265 (N.D. Ala. 2005) ("[T]he question [under the sixth sentence] is not whether there is good cause for failure to present the evidence at the ALJ level, but rather for failure to present it at the administrative level, which includes the Appeals Council

stage."). In an apparent attempt to demonstrate good cause, Plaintiff's counsel asserts that Plaintiff was unrepresented and suffered from severe mental impairments, and further, that because "the treatment was court-ordered, [Plaintiff] may have had difficulty obtaining a copy of the records himself" (Doc. 16 at 19). These assertions are not persuasive. Although Plaintiff was unrepresented, he was well-educated with a law degree, and he submitted to the AC an eleven-page (typed and single-spaced) request for review that included citations to relevant Social Security Regulations and federal case law (*see* Tr. 334–44). Moreover, in his request Plaintiff specifically asked that the AC consider only the evidence that was part of the record before the ALJ and seemingly acknowledged his understanding that new evidence could be presented, yet he chose not to do so (*see* Tr. 334–35). Furthermore, Plaintiff has offered no basis for the proposition that evidence regarding court-ordered treatment, as opposed to voluntary treatment, is not obtainable—a proposition that is belied by Plaintiff's subsequent acquisition of the records, now filed with this court. In short, Plaintiff was well aware of the existence of the records at the time he sought review by the AC, and he has offered no substantial justification for his failure to submit the records to the AC. The Eleventh Circuit has held that:

> The good cause requirement is satisfied when the evidence did not exist at the time of the administrative proceedings. Cannon v. Bowen, 858 F.2d 1541, 1546 (11th Cir.1988); Milano v. Bowen, 809 F.2d 763, 767 (11th Cir. 1987). The good cause requirement was designed to avoid the danger of "encouraging claimants to seek after-acquired evidence, and then use such evidence as an unsanctioned 'backdoor' means of appeal." Milano, 809 F.2d at 767 (citation omitted).

Archer v. Comm'r. of Soc. Sec. Admin., 176 Fed. Appx. 80, 82 n.3 (11th Cir. 2006).

Here, as discussed above, the evidence at issue did in fact exist at the time of the ALJ's decision and at the time Plaintiff sought review by the AC, and Plaintiff has failed to show good cause for his failure to submit it below. Indeed, it appears that Plaintiff is seeking to do exactly what the Eleventh Circuit has frowned upon; that is, using the treatment records as a backdoor means of appeal. Plaintiff has therefore failed to establish the third prong for remand for consideration of the new evidence. And, because all three prongs have not been established, remand pursuant to sentence six is not appropriate.

Moreover, the record before the ALJ following remand by the AC, which includes the new evidence offered by Dr. Davis, contained sufficient information to decide the case, and the ALJ

therefore did not err by failing to further develop the record. Graham, 129 F.3d at 1423 (holding that where the record is complete and adequate to make a decision, no showing of prejudice is made). Lastly, despite the ALJ's failure to obtain the treatment records, the AC did not find that the ALJ failed to fully develop the record and found no reason under its rules to review the ALJ's decision (Tr. 1). Accordingly, Plaintiff is not entitled to relief.

B.    Credibility Findings

Plaintiff next contends that the ALJ erred in rejecting his allegations of disabling symptoms (Doc. 16 at 14–16). As this court is well aware, "If the Commissioner refuses to credit [subjective testimony of the plaintiff] he must do so explicitly and give reasons for that decision. . . . Where he fails to do so we hold as a matter of law that he has accepted that testimony as true." MacGregor, 786 F.2d at 1054; Holt v. Sullivan, 921 F.2d at 1221, 1223 (11th Cir. 1991). "Although this circuit does not require an explicit finding as to credibility, . . . the implication must be obvious to the reviewing court. The credibility determination does not need to cite particular phrases or formulations but it cannot merely be a broad rejection which is not enough to enable [the district court or this Court] to conclude that [the ALJ] considered [plaintiff's] medical condition as a whole." Dyer v. Barnhart, 395 F.3d 1206, 1210 (11th Cir. 2005) (internal quotations and citations omitted). The reasons articulated for disregarding the plaintiff's subjective pain testimony must be based upon substantial evidence. Jones v. Dep't of Health and Human Serv's, 941 F.2d 1529, 1532 (11th Cir. 1991).

In finding Plaintiff less than fully credible, the ALJ first noted the factors he must consider and the regulations he must apply in evaluating Plaintiff's credibility (see Tr. 10–11). The ALJ then noted that Plaintiff first received mental health treatment in April 2006, during his incarceration in Nashville (Tr. 12).[14] The ALJ also noted that Plaintiff refused medication, both during his incarceration and when it was later recommended by Dr. Peterson, a factor that was properly considered by the ALJ (Tr. 12, 16). See Dawkins v. Bowen, 848 F.2d 1211, 1213 (11th Cir. 1988)

---

[14] While not directly stated by the ALJ, it appears that the ALJ might have considered that Plaintiff was returned to the United States and incarcerated in Nashville in or about October 2005, but he did not report to CCS staff any mental health issues or discuss the contitions of his Brazilian confinement until April 2006 (even though he was seen by CCS staff as early as November 3, 2005). It seems curious that Plaintiff did not immediately report his experiences in Brazil; similarly, it seems he would not have fought extradition if the conditions were as deplorable as he has described.

(refusal to follow prescribed medical treatment without a good reason will preclude a finding of disability); Ellison v. Barnhart, 355 F.3d 1272, 1275 (11th Cir. 2003) ("[T]he ALJ's consideration of Ellison's noncompliance as a factor in discrediting Ellison's allegations of disability is adequately supported . . . ."). Next, the ALJ discussed Plaintiff's evaluation by Dr. Peterson on October 17, 2006, including the fact that Plaintiff brought to the evaluation a note indicating that he was disabled and unable to work, but Dr. Peterson declined to sign it, and that Plaintiff refused to set a follow-up appointment with Dr. Peterson (Tr. 12). The ALJ also noted Dr. Peterson's opinion that Plaintiff would actually benefit from going back to work and that when he advised Plaintiff of his opinion, Plaintiff told Dr. Peterson that he wanted him to "be silent" about it (id.). Additionally, the ALJ noted that Plaintiff told Dr. Peterson his goal was to return to Brazil as soon as possible, and that Plaintiff believed he could get to Brazil sooner if he was on disability (Tr. 387). It matters not whether Plaintiff was mistaken in his belief; what matters is that Plaintiff's conduct establishes an ulterior motive for seeking disability. See Eichelberger v. Barnhart, 390 F.3d 584, 590 (8th Cir. 2004) (an ALJ may discount a claimant's subjective complaints for, among other reasons, that she appeared to be motivated to qualify for disability benefits); Frey v. Bowen, 816 F.2d 508, 516 (10th Cir. 1987) (citing Byron v. Heckler, 742 F.2d 1232, 1235 (10th Cir. 1984) (subjective complaints must be evaluated with due consideration for credibility, motivation, and medical evidence)); Gaddis v. Chater, 76 F.3d 893, 895–96 (8th Cir. 1996) (strong element of secondary gain in plaintiff's conduct belies his sincere belief that he is truly disabled and unable to perform any substantial gainful activity). Continuing, the ALJ noted Plaintiff's evaluation by Mr. Gale, which essentially revealed that Plaintiff has some limitations, but not disabling limitations, and the evaluation by Ms. Walker, which led her to conclude that Plaintiff was malingering and/or exaggerating symptoms (see Tr. 12–13, 15). See Jones v. Callahan, 122 F.3d 1148, 1152 (8th Cir. 1997) (exaggeration of symptoms is a factor to be weighed in evaluating subjective complaints of pain). Lastly, the ALJ noted the testimony of Dr. Davis, including his opinion that Plaintiff's IQ scores are inconsistent with his educational background, and his overall opinion—like that of Ms. Walker—that Plaintiff was malingering (Tr. 14).[15]

---

[15] Plaintiff contends that the ALJ provided only one reason for discounting his complaints; namely, Plaintiff's desire to return to Brazil and his belief that being on disability would hasten his return (see Doc. 16 at 14). The undersigned, however, finds otherwise. The ALJ discussed at length the factors and regulations he must consider in

Case No. 3:08cv427/RV/EMT

Thus, because the ALJ articulated the inconsistencies on which he relied in discrediting Plaintiff's statements regarding his subjective complaints, and because his credibility finding is supported by substantial evidence on the record as a whole, the ALJ did not err, and his credibility finding should be affirmed.  *See* Foote, 67 F.3d at 1562; MacGregor, 786 F.2d at 1054.

C.      Questioning of the Vocational Expert ("VE")

Lastly, Plaintiff contends the ALJ erred by posing incomplete hypothetical questions to the VE, generally asserting that Dr. Boero's "marked" limitations should have been included in the questions, as well as the limitations described in the affidavits submitted by Plaintiff's family members (*see* Doc. 16 at 16–17).

The ALJ did not include "marked limitations" in his hypothetical questions because he discredited Dr. Boero's opinions.  Substantial weight must be given to the opinion, diagnosis and medical evidence of a treating physician unless there is good cause to do otherwise.  *See* Lewis, 125 F.3d at 1439–41; Edwards v. Sullivan, 937 F.2d 580, 583 (11th Cir. 1991);  Sabo v. Chater,  955 F. Supp. 1456, 1462 (M.D. Fla. 1996); 20 C.F.R. § 404.1527(d).  "'[G]ood cause' exists when the: (1) treating physician's opinion was not bolstered by the evidence; (2) evidence supported a contrary finding; or (3) treating physician's opinion was conclusory or inconsistent with the doctor's own medical records."  Phillips v. Barnhart, 357 F.3d 1232, 1240–41 (11th Cir. 2004) (citation omitted).

Here, in discrediting Dr. Boero's opinions, the ALJ noted that the opinions are inconsistent with other evidence in the record, including the records and/or opinions of Dr. Peterson, Dr. Davis, Ms. Walker, and Mr. Gale (*see* Tr. 13–15).  Similarly, the ALJ noted that the opinions of Dr. Peterson, Dr. Davis, Ms. Walker, and Mr. Gale were generally consistent with each other but inconsistent with the opinions of Dr. Boero (*id.*).  The ALJ also noted that the opinions on the medical source statement are not actually the opinions of Dr. Boero but rather the opinions of Plaintiff (Tr. 14).  Indeed, as noted *supra*, the medical source statement specifically states that the

---

evaluating Plaintiff's credibility (*see* Tr. 10–11).  Immediately thereafter the ALJ mentioned Plaintiff's refusal to take medication on two occasions (*see* Tr. 12).  The ALJ also noted Plaintiff's  ability to perform "serial sevens" for Dr. Gale but not Ms. Walker, as well as Ms. Walker's belief that Plaintiff was malingering and the other factors the undersigned has previously discussed in this Report and Recommendation (*see* Tr. 12–15).  Even if the ALJ did not explicitly state that each factor was a basis for discounting Plaintiff's complaints, the implication is obvious from a reading of the ALJ's opinion as a whole.

marked limitations are based on Plaintiff's reports.[16]  And, because the ALJ properly concluded that Plaintiff's subjective complaints were unworthy of belief, he was likewise justified in concluding that limitations based on the same complaints were not credible.  Further, the ALJ correctly noted that "[w]hether or not a person is disabled and unable to work is an issue reserved for the Commissioner," and therefore, he was not required to accept as true the opinion of Dr. Boero that Plaintiff is unable to work (Tr. 14).  In sum, the ALJ articulated his reasons for discounting the opinions of Dr. Boero, the reasons have substantial support in the record, and the reasons constitute "good cause" for discounting the opinions.  Phillips, 357 F.3d at 1240–41.  Thus, Dr. Boero's opinions need not have been included in the ALJ's hypothetical questions.  *See* McSwain v. Bowen, 814 F.2d 617, 620 n.2 (11th Cir. 1987) (the ALJ is not required to include findings in the hypothetical that he has properly rejected as unsupported)

As for the opinions contained in the affidavits submitted by Plaintiff's family members, the ALJ found them "suspect," stating that the affidavits from Plaintiff's mother and brother were worded very similarly to each other's, as were the affidavits from Plaintiff's sister and brother-in-law (Tr. 16).  The ALJ also noted that all four affidavits "were typed in the identical single-spaced style" as other documents submitted by Plaintiff in this case, suggesting that Plaintiff prepared the affidavits and asked his family members to sign them, "especially" since Plaintiff had prepared a pre-written statement for Dr. Peterson and asked him to sign it (*id*.).  The undersigned agrees with the ALJ's assessment that the affidavits are "suspect" and finds that the ALJ properly excluded the limitations contained therein from his hypothetical questions.  Moreover, the ALJ's reasons for finding Plaintiff less than fully credible apply with equal force to the opinions of his family members.  *See* Lorenzen v. Chater, 71 F.3d 316, 319 (8th Cir. 1995) (arguable failure of ALJ specifically to discredit witness has no bearing on outcome when witness's testimony is discredited by same evidence that proves claimant's testimony not credible).  Therefore, even if the ALJ's stated reasons for discounting the opinions are erroneous, or even if the ALJ had ignored the opinions

---

[16] Additionally, it is unclear who prepared this form for Dr. Boero's signature.  Although Dr. Boero might have prepared it, the handwriting on the form is altogether inconsistent with Dr. Boero's signature and printed name on the last page of the form (*compare* Tr. 430–31 *with* Tr. 432).  Moreover, questions on the form regarding Plaintiff's ability to perform "simple" work tasks were not answered (*see* Tr. 430).  Thus, it is unclear whether Dr. Boero's opinions would have— at least in part—been consistent with the ALJ's ultimate finding that Plaintiff was limited to simple, unskilled work.

altogether, Plaintiff is not entitled to relief because the ALJ's reasons for discounting Plaintiff's complaints also discredit the opinions on the affidavits. *Cf.* East v. Barnhart, 197 Fed. Appx. 899, 901 n.3 (11th Cir. 2006) (failure to mention psychologist's report harmless where findings in report were consistent with ALJ's ultimate determination).

VI.    CONCLUSION

For the foregoing reasons, the Commissioner's decision is supported by substantial evidence and should not be disturbed. 42 U.S.C. § 405(g); Lewis, 125 F. 3d at 1439; Foote, 67 F.3d at1560. Furthermore, Plaintiff has failed to show that the ALJ applied improper legal standards, erred in making his findings, or that any other ground for reversal exists.

Accordingly, it is respectfully **RECOMMENDED** that the decision of the Commissioner be **AFFIRMED**, that this action be **DISMISSED,** and that the clerk be directed to close the file.

At Pensacola, Florida this 26th day of August 2009.

/s/ *Elizabeth M. Timothy*
**ELIZABETH M. TIMOTHY**
**UNITED STATES MAGISTRATE JUDGE**

**NOTICE TO THE PARTIES**

**Any objections to these proposed recommendations must be filed within ten days after being served a copy hereof. Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control. A copy of any objections shall be served upon any other parties. Failure to object may limit the scope of appellate review of factual findings.** *See* **28 U.S.C. § 636;** United States v. Roberts, **858 F.2d 698, 701 (11th Cir. 1988).**